**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**UNITED STATES OF AMERICA**

**vs.** **CRIMINAL No.: 3:06-CR-00024-HTW-LGI**

**JOE LEWIS COLLINS**

---

# ORDER

---

BEFORE THIS COURT is Joe Lewis Collins's ("Collins") "Motion for Compassionate Release / Reduction in Sentence", filed pursuant to Title 18 U.S.C. § 3582(c)(1)(A)[1] and the First Step Act of 2018[2] [Docket No. 124]. Collins asks this court to reduce his current sentence of concurrent life terms to a term of 25 years. Collins bases his motion on his advanced age (75); chronic medical conditions, allegedly resulting from contracting COVID-19[3]; the Bureau of Prisons' allegedly deficient pandemic response thereto; and his post-conviction rehabilitation.

The United States of America ("United States") filed a Response in Opposition [Docket No. 132], asserting therein that Collins has failed to establish extraordinary and compelling reasons

---

[1] **Title 18 U.S.C. § 3582(c)(1)(A)** provides in relevant part: "The court may not modify a term of imprisonment once it has been imposed except that—(1) in any case—(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—(i) extraordinary and compelling reasons warrant such a reduction... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

[2] **First Step Act of 2018**, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (2018) amended Title 18 U.S.C. § 3582(c)(1)(A) to provide in relevant part: "...the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment..."

[3] Collins has been vaccinated for COVID-19. *See* Exhibit 2 to ECF 132 (Immunization Record).

for the remedy he seeks. Moreover, adds the United States, Collins remains a profound danger to society. Having reviewed the motion, the response, the record, and the relevant legal authority, this court finds that Collins's motion is not well-taken and must be DENIED.

## I. BACKGROUND

### A. Factual Background and Criminal Conduct

On February 7, 2006, a federal grand jury returned a two-count indictment against the Defendant, Joe Lewis Collins, charging him with related federal offenses. Count 1 charged Collins with conspiracy to commit murder in violation of Title 18 U.S.C. § 1512(k)[4]. Count 2 charged Collins with the murder of a government witness in violation of Title 18 U.S.C. §§ 1512(a)(1)(A)[5] and 1523(a)(3)[6].

The charges stemmed from a gruesome plot orchestrated by Collins and his co-conspirators. The Government established at trial that Collins had conspired with multiple individuals, namely Levon Edmond, Kathleen Nelson, and Roosevelt Walker, to murder Clovis Reed, a pending trial witness. The purpose of this conspiracy was to prevent Reed from providing testimony against these individuals at an upcoming federal criminal trial. The conspirators, including Collins, carried out their unholy plan; brutally murdered Reed; and literally dismembered her body by severing her head and hands in an effort to conceal the crime and protect their involvement.

---

[4]**Title 18 U.S.C. § 1512(k)** provides: "Whoever conspires to commit any offense defined in this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

[5] **Title 18 U.S.C. § 1512(a)(1)(A)** provides: "(a)(1) Whoever kills or attempts to kill another person, with intent to—(A) prevent the attendance or testimony of any person in an official proceeding... shall be punished as provided in paragraph (3)."

[6] **Title 18 U.S.C. § 1512(a)(3)** provides: "(3) The punishment for an offense under this subsection is—(A) in the case of a killing, the punishment provided in sections 1111 and 1112; and (B) in the case of an attempt, imprisonment for not more than 30 years."

At the outset, prior to the murder plan, Joe Lewis Collins was involved in a conspiracy, with the others, to defraud the United States Government by filing fraudulent claims for funds with the Facilitator of the Pickford Glickman Black Farmers Settlement ("PGBF")[7]. Collins and his co-conspirators were not entitled to any such funds. They were not farmers; they did not pursue legal steps to apply for financial remuneration under the Act; nor were their "applications" approved by any government authority. The fraud conspiracy was hatched upon co-conspirator Kathleen Nelson being schooled in the State of Georgia by an ex-student of hers how easily the conspirators could submit false applications and have them processed in Atlanta, Georgia, by an unnamed conspirator in the office of the Claims Facilitator. Once "processed", an application would be approved for a hefty sum that would be divided among the co-conspirators[8].

The scheme, among the identified schemers herein, proceeded as plotted. A false application was sent attesting to the status of the applicant, as a farmer, who had rightfully applied to the Claims Facilitator for a loan under the PGBF for proceeds to save/further a farm land endeavor desperately in need for the funds, but previously had been denied such funds on a racially-discriminatory basis. The successful lawsuit of *Pigford v. Glickman* revealed the discrimination and ordered the Department of Agriculture to revive the dismissed applications and

---

[7] *Pigford v. Glickman* was a historic class-action lawsuit alleging that the United States Department of Agriculture (USDA) systematically discriminated against African American farmers in the administration of farm loan programs and disaster assistance between 1981 and 1996, while failing to investigate complaints of discrimination. The resulting 1999 consent decree established a two-track dispute resolution mechanism that provided a class of eligible Black farmers with little or no documentary evidence with a virtually-automatic cash payment of $50,000, and forgiveness of debt owed to the USDA (Track A), while those who believed they could prove their cases with documentary or other evidence by a preponderance of the evidence—the traditional burden of proof in civil litigation—had no cap on the amount they may recover (Track B). *See Pigford v. Glickman*, 185 F.R.D. 82, 95 (D.D.C. 1999), *aff'd*, 206 F.3d 1212 (D.C. Cir. 2000).

[8] This scheme actually succeeded for other separate kindred conspiracies developed in Canton, Mississippi. These other fraudulent crimes were never prosecuted.

provide the money these African-American victims should have received. Following a fraudulent approval of the application, the Claims Facilitator at the Atlanta hub sent a check to Clovis Reed.

At that point, the scheme collapsed as it saw the conspirators part ways, ultimately down the path leading to murder. Reed, as later learned, was not a "victim"; she actually was a member of the Edmond-Nelson-Walker ring formed to swindle the PGBF. Reed, though, decided not to share with the others; she determined to keep all of the money. Kathleen Nelson and her sister, Levon Edmond, then stole the check, deposited it in a bank under an assumed name, then went to a nearby separate bank and withdrew the funds.

Irate, Reed, who saw herself as a victim, while the other conspirators saw her as a "crook"[9], for her refusal to share with them. When the sisters refused to return the $50,000 to Reed, she threatened to go to the police if the pair would not give her back the money. The sisters refused, but were confident that Reed would not report this matter to the police, since a report might trigger an investigation into how the check was supposedly approved.

Reed surprised the sisters and went to the police anyhow. She claimed that the sisters had stolen her "lawful" check. Still, the sisters refused to give Reed the money, viewing Reed's police contact as simply as bluff. Reed, though, stood resolute and even with the approach of a criminal trial on a grand jury approved indictment, would not back off her criminal charges.

The United States Attorney's Office accepted Reed's story, so much so that the United States Attorney, as said, presented the matter to a grand jury, which returned, against the sisters, an indictment, drawn under Title 18 U.S.C. § 510(a)(1)[10] for public money theft and federal check forgery involving the stolen $50,000 government check belonging to Clovis Reed.

---

[9] At trial, Edmond, who turned on her fellow conspirators, described Reed as such when Edmond testified why she and the other conspirators had decided to murder Reed.

[10] **(a)** Whoever, with intent to defraud--

Reed was scheduled to testify as a government witness against both defendants at a federal trial set before this court for April 2003; however, immediately before the trial date, the prosecution alerted this court that the prosecutors had been unable to locate Reed, an odd circumstance since until then, she always had been accessible. The prosecution feared foul play and notified law enforcement, especially the Canton, Mississippi Police Department; the Mississippi Highway Safety Patrol; the Jackson, Mississippi Police Department; and the United States Marshal's Office for the Southern District of Mississippi.

Later that day, on April 3, 2003, the Jackson Police Department recovered Reed's abandoned vehicle, located in a Jackson, Mississippi high crime area. The vehicle contained blood stains and featured a broken window on the driver's side. Whereabouts of Reed were still unknown, but on April 4, 2003, law enforcement in Simpson County, Mississippi, approximately 100 miles south of Jackson, were directed to a decapitated female body, also missing its hands, was discovered on hunting land in Simpson County, Mississippi. Later, that body was identified through DNA testing[11] as that of Clovis Reed.

A subsequent law enforcement investigation connected Edmond and Nelson to an associate Roosevelt Walker, who had lived within 1.5 miles of the recovery site and shared an acquaintance with the land's overseer.

---

**(1)** falsely makes or forges any endorsement or signature on a Treasury check or bond or security of the United States… shall be fined under this title or imprisoned not more than ten years, or both.
18 U.S.C.A. § 510 (West).

[11] DNA testing can determine "whether a biological tissue matches a suspect with near certainty." *Maryland v. King*, 569 U.S. 435, 443 (2013) (quoting *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52, 62 (2009)).

On October 7, 2003, the prosecution filed a Superseding Indictment, charging Edmond, Nelson, and Walker with conspiracy to kill a government witness. During its presentation of this matter to the grand jury, as well as during its preparation for a trial of the indicted murderers, the prosecution (and this court) were totally persuaded that this alleged murder was a product of government theft, perpetrated by some enterprising culprits who, somehow, had discovered that victim Reed was to receive an authorized check of $50,000. The prosecution was in for a surprise.

During the murder-conspiracy trial, co-conspirator Edmond, sister to Nelson, elected to plead guilty in exchange for a term sentence in lieu of a possible one of life imprisonment or death. Her deal with the government required her to testify against the other conspirators, including her sister Nelson. And, she did, laying out in great detail the particulars of the scheme to defraud the government, and the morph of that fraud crime into the crime of murder.

The judge and trial jury were shocked to learn from Edmond's testimony three amazing new facts:

(1) Clovis Reed was not a traditional victim; she was from the outset a perpetrator, a member of the Edmond-Nelson-Walker gang that schemed to defraud the government of funds in the PGB;

(2) Joe Lewis Collins, an uneducated co-conspirator was the person who had strangled Reed to death, He, with the assistance of Roosevelt Walker, had decapitated Reed's dead body and severed her hands; and

(3) The "Edmond-Nelson-Walker-Collins gang had been schooled on the tactics of the fraud scheme by an Ebony Scott of Georgia. Scott had relocated to Canton, Mississippi to help direct the fraud scheme and to obtain a share of the funds, but that the gang and

Scott had quarreled on an agreed division of proceeds and the gang had killed Scott and disposed of her mutilated body in Simpson County, Mississippi.

Edmond's testimony revealed the above facts and more:

The check from the government was to be mailed to Reed, since she had signed the false application. When the check came, Reed, however, said she would not share with the others when she received the $50,000 check. Edmond, Nelson, Walker, and Collins plotted the theft of the check before Reed actually received the check, and decided to murder Reed. And, they did. Reed's former lover, Joe Lewis Collins, was assigned the task of ambushing Reed on her way home after work one night and killing her. Then, he and Walker would dismember her body and bury the body in Simpson County, Mississippi.

Edmond testified that Collins told the group that after a tense struggle with Reed, he managed to suffocate her in her automobile. He said, according to Edmond, that he had waited for her in the street close to her home and had engaged her once he got into her car.

Thereafter, the group executed their plans to dispose of the body. Collins and Walker first were supposed to drive Reed's car from the Canton, Mississippi area to a high crime area in Jackson, Mississippi; abandon the vehicle there, with broken window glass left on the ground, to mislead the police and cause them to opine that strangers to her had forcibly entered her car and made off with her body; and then transport Reed's body in another car to Simpson County, Mississippi, some 100 miles south of Jackson, Mississippi, to bury it on property well-known to Walker.

Once in Simpson County, Collins and Walker dismembered Reed's body and selected a site for the burial. The pair, however, were mindful of the time and approaching daylight and feared that someone, who knew either of them, might see them so far away from their homes in

Canton, Mississippi; so they left the body unburied, hurried back to Canton, but expecting to return the following day to finish digging a grave for Reed.

That next daylight morning, an individual who cultivated bees for a living, on his way to his beehive, cut across the land where Reed's body had been left. Thinking the remains were those of a wild animal, he cautiously approached, only to discover that the remains were human, but mutilated. He alerted the authorities.

The conspiratorial group, according to Edmond previously had killed Ebony Scott of Georgia, an original conspirator, who had come from Georgia to Mississippi, with her infant daughter, to be a part of the Mississippi scheme she had helped to form. Bones allegedly belonging to Scott later were found in the area where Reed's body had been found. The government never indicted anyone for Scott's murder. Disturbingly, after Scott's murder, the family of Kathleen Nelson and Edmond had proceeded to raise[12] and school Scott's four-year-old child.

The charges against Collins arising from the above events implicated the Federal Death Penalty Act of 1994 ("FDPA")[13], 18 U.S.C. §§ 3591–3599, which governs the procedures for seeking and imposing a federal death sentence. A death-eligible charge, procedure-wise however, does not mean that the Government will be authorized to seek a death sentence. Several procedural steps stand in the way before a local United States Attorney can argue for a death sentence before a jury. These mandatory steps are as follows: First, before trial, the Department of Justice ("DOJ") conducts an internal review, separate from the judicial proceedings, to determine whether the

[12] This court reported this development to Mississippi Department of Child Protective Services, but that State agency surprisingly declined to remove the child from that environment at that time because of the child's age (approximately four).

[13] *See* 18 U.S.C. §§ 3591–3594. The Federal Death Penalty Act distinguishes the Government's decision to seek death, the determination of guilt, the defendant's eligibility for a death sentence, and the jury's selection of the appropriate punishment.

prosecution may seek the death penalty. As part of that review, defense counsel may submit mitigating materials and present reasons why the death penalty should not be sought. *United States v. Frye*, 372 F.3d 729, 740-41 (5th Cir. 2004) (describing the submission of defense mitigation materials to the Capital Review Committee and the Committee's recommendation to the Attorney General). That review determines only whether prosecutors will be authorized to seek a death sentence; it does not determine the defendant's guilt or punishment. The DOJ treats its deliberations and internal recommendations as confidential.

The local trial judge does not participate in that process at all, and ordinarily receives only the DOJ's final decision.[14] If the DOJ authorizes the prosecution to seek death, the Government must file and serve a notice identifying its intent to do so, and the aggravating factors upon which it intends to rely. 18 U.S.C. § 3593(a)[15].

The local trial then proceeds in two stages: the trial jury first determines guilt, and, only after a conviction for a death-eligible offense may that first jury participate in a separate penalty proceeding to determine whether the defendant is eligible for death and whether that punishment is warranted. *See* 18 U.S.C. §§ 3591–3594; *Jones v. United States*, 527 U.S. 373, 376–79 (1999) (explaining the eligibility and sentence-selection determinations under the FDPA); *United States*

[14] The Department's current procedures also provide for consultation with reasonably available members of the victim's family and permit defense counsel to present mitigating evidence and argument before a decision authorizing a capital prosecution is made. *See* U.S. Dep't of Justice, Justice Manual §§ 9-10.050, 9-10.080, 9-10.100, 9-10.130, 9-10.150 (June 2026), available at https://www.justice.gov/jm/jm-9-10000-capital-crimes. The Department's internal decisional materials are not subject to discovery under Federal Rule of Criminal Procedure 16(a)(2). *Id.* § 9-10.080.

[15] Section 3593(a) requires the attorney for the Government, a reasonable time before trial or acceptance of a guilty plea, to sign and file with the court—and serve upon the defendant—a notice stating that the Government intends to seek a death sentence and identifying the aggravating factors it proposes to prove. The court may permit the Government to amend the notice upon a showing of good cause. 18 U.S.C. § 3593(a).

*v. Williams*, 400 F.3d 277, 281–83 (5th Cir. 2005) (describing the FDPA's bifurcated guilt and penalty proceedings).

In Collins's case, the DOJ ultimately directed the Government not to seek the death penalty. The Government therefore did not file a death notice, and no capital penalty phase could follow a conviction. The DOJ's decision did not invalidate the indictment, determine Collins's guilt, or otherwise direct this court's adjudication of the offenses charged. It simply removed death as an available punishment.

The DOJ's decision not to seek the death penalty surprised this court. The DOJ's internal recommendations and deliberations are confidential; therefore, this court was not informed of the considerations underlying that decision and did not purport to know the DOJ's actual reasoning. Only after Edmond testified against the other conspirators did this court and the Federal Bureau of Investigation learn that Reed had participated in the fraud conspiracy and had filed a false theft report portraying herself as its victim. That testimony at trial supplied a possible explanation for the Department's decision, but the evidence presented at trial would reveal still more.

Edmond testified that she, her sister, and Roosevelt Walker throughout this criminal enterprise, had been joined from the outset by Joe Lewis Collins, who, when Reed had balked at sharing the fraud money, volunteered to be the one to ambush Reed in Canton, Mississippi, kill her, drive and abandon her car in Jackson, Mississippi, at a large residential apartment complex, then, with Roosevelt Walker, transport her body approximately 100 miles south to Simpson County, Mississippi, where he and Walker would dismember the body, as may have been the case with the body of Ebony Scott.

Later, after the murder, Collins met with the other conspirators, carrying a mysterious bag. Inside, said Edmond, was the head of Reed, Collins's former girlfriend. Reed had quarreled with

the others and threatened to go to the police if the others did not leave her alone. When they persisted, she did go to the police and portrayed herself as a legitimate victim of the group's effort to take her "honestly-acquired money". The United States Attorney believed her story completely and, thereafter, looked upon her as a victim and witness.

As stated supra, on February 7, 2006, a federal grand jury returned an indictment, charging Collins with conspiracy to commit murder, and murder of a government witness.

## B. Procedural History

On September 18, 2008, a twelve-person federal petit jury found the Defendant Joe Lewis Collins guilty on both counts of the indictment. During a sentencing hearing held on January 21, 2009, this court sentenced Collins to serve a term of life imprisonment on Count 1 and to a concurrent term of life imprisonment on Count 2. The court also imposed a five-year term of supervised release and a special assessment. Collins is currently serving his sentence at the Federal Correctional Institution in Talladega, Alabama ("FCI Talladega"). He has no scheduled release date.

On April 22, 2021, Collins submitted a written request for compassionate release to the Warden of FCI Talladega. The Warden denied the request on May 2, 2021. Collins subsequently filed on October 24, 2022, the instant pro se[16] Motion for Compassionate Release in this court. The Government concedes that Collins filed his motion after the statutory 30-day waiting period, making the motion procedurally ripe for judicial review.

[16]*Pro se* is a Latin term meaning "for oneself" or "on one's own behalf." In a legal context, it refers to parties who represents themselves in a legal proceeding without the assistance of an attorney. See *Pro Se*, Black's Law Dictionary (11th ed. 2019); *see also* 28 U.S.C. § 1654 (granting litigants the right to plead and conduct their own cases personally in federal courts).

## II. JURISDICTION

This court possesses subject-matter jurisdiction over the instant matter pursuant to Title 18 U.S.C. § 3231[17], which grants United States district courts original, exclusive jurisdiction over all offenses against the laws of the United States. This court retains continuing jurisdiction to modify a previously imposed term of imprisonment only to the extent explicitly authorized by federal statute, specifically Title 18 U.S.C. § 3582(c)(1)(A)[18].

## III. LEGAL STANDARD

A district court generally cannot modify a term of imprisonment once it has been imposed. Title 18 U.S.C. § 3582(c) creates a narrow exception to this rule. Under the First Step Act of 2018, an incarcerated individual may petition the court directly for a sentence reduction only after fully exhausting all administrative remedies with the Bureau of Prisons ("BOP"), or after the lapse of

---

[17] **Title 18 U.S.C. § 3231** provides: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States. Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

[18] (c) Modification of an imposed term of imprisonment.--The court may not modify a term of imprisonment once it has been imposed except that--

(1) in any case--

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that--

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission…

18 U.S.C.A. § 3582 (West)

30 days from the receipt of such a request by the warden of the facility, whichever occurs earlier *See United States v. Chambliss*, 948 F.3d 691, 692–93 (5th Cir. 2020).

After exhaustion, a defendant seeking compassionate release must establish that extraordinary and compelling reasons warrant a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). The defendant bears the burden of making that showing. *United States v. Jackson*, 27 F.4th 1088, 1090 (5th Cir. 2022).

The Sentencing Commission's current policy statement applies to compassionate-release motions filed by either the Director of the Bureau of Prisons or a defendant. U.S.S.G. § 1B1.13(a). It permits a reduction only if, after considering the applicable sentencing factors under 18 U.S.C. § 3553(a), the court determines that: (1) extraordinary and compelling reasons warrant a reduction; (2) the defendant is not a danger to the safety of another person or the community under 18 U.S.C. § 3142(g); and (3) the reduction is consistent with § 1B1.13. U.S.S.G. § 1B1.13(a)(1)–(3)[19].

Section 1B1.13(b) identifies six categories of extraordinary and compelling reasons: (1) the defendant's medical circumstances; (2) the defendant's age; (3) specified family circumstances; (4) abuse suffered while in custody; (5) other circumstances or combinations of circumstances similar in gravity to the enumerated reasons; and, (6) in narrowly defined circumstances, an unusually long sentence resulting from a change in law. U.S.S.G. § 1B1.13(b)(1)–(6).

[19] Effective November 1, 2023, the Sentencing Commission amended § 1B1.13 to make the policy statement applicable to motions filed by defendants as well as motions filed by the Director of the Federal Bureau of Prisons. The amendment moved the descriptions of the permissible bases for a reduction from former Application Note 1 into the policy statement itself, expanded the specified extraordinary and compelling reasons, and replaced the former catchall—which authorized only the Director of the Bureau of Prisons to identify "other reasons"—with a provision permitting courts to consider other circumstances, or combinations of circumstances, that are similar in gravity to the enumerated reasons. *See* U.S.S.G. app. C, amend. 814 (effective Nov. 1, 2023); U.S.S.G. § 1B1.13(a)–(b)(5) (2026).

Collins principally invokes the medical-circumstances and age provisions. His chronic medical conditions, alleged lingering effects of COVID-19, use of a walking cane, and concerns about the prison environment fall within the medical-circumstances inquiry under § 1B1.13(b)(1). His age and length of incarceration implicate § 1B1.13(b)(2). To the extent Collins relies on the combined effect of his age, medical conditions, prison circumstances, and rehabilitation, the court considers that contention under the catchall provision in § 1B1.13(b)(5).

Collins does not rely on qualifying family circumstances under § 1B1.13(b)(3) or abuse suffered while in custody under § 1B1.13(b)(4). His comparison of his life sentence to national sentencing averages also does not implicate the unusually-long-sentence provision in § 1B1.13(b)(6), because he identifies no intervening change in law that would produce a gross disparity between his present sentence and the sentence likely to be imposed today.

Rehabilitation alone cannot constitute an extraordinary and compelling reason for a sentence reduction. 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13(d). The court may, however, consider rehabilitation in combination with other circumstances when determining whether a qualifying reason exists and, if so, the extent of any reduction. U.S.S.G. § 1B1.13(d).

The requirements governing compassionate release are conjunctive, but neither § 3582(c)(1)(A) nor § 1B1.13 prescribes a mandatory order in which the court must address them. A court may deny relief upon determining that the defendant has not established an extraordinary and compelling reason, that the defendant remains a danger to another person or the community, or that the § 3553(a) factors do not support a reduction. *Jackson*, 27 F.4th at 1093 & n.8; *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020). Accordingly, dangerousness requires an independent inquiry, but the court need not undertake that inquiry first.

## IV. DISCUSSION

Collins asks this court to reduce his double life sentence to 25 years. He contends that his advanced age (75 years old), his chronic medical conditions resulting from a prior COVID-19 infection, the general health risks inherent to a congregate prison setting, and his positive post-conviction conduct collectively constitute extraordinary and compelling reasons. The court will address these arguments and evaluate them under the statutory criteria.

### A. Administrative Exhaustion

The record indicates that Collins submitted a formal compassionate release request to the Warden of FCI Talladega on April 22, 2021. The Warden denied that request on May 2, 2021. *See* Exhibit 2 to ECF No. 132 (Administrative Remedy Generalized Retrieval).

More than 30 days elapsed between the administrative denial and the initiation of this judicial proceeding; accordingly, Collins has satisfied the threshold exhaustion requirements mandated by Title 18 U.S.C. § 3582(c)(1)(A)[20]. No party has refuted this assertion.

### B. Extraordinary and Compelling Reasons

Collins has failed to carry his burden to show extraordinary and compelling circumstances that would justify a sentence reduction.

Collins relies heavily on his fear of COVID-19 and the lingering effects of a prior infection. The Fifth Circuit, though, repeatedly has held that the general risk, or generalized fear of contracting COVID-19 in a prison environment does not provide an extraordinary and compelling reason for release. *United States v. Thompson*, 984 F.3d 431, 434–35 (5th Cir. 2021). Medical records confirm that Collins received a full course of the COVID-19 vaccine[21]. The widespread

[20] Title 18 U.S.C. § 3582(c)(1)(A) sets forth the exhaustion prerequisites, requiring thirty days to expire from the receipt of an administrative request by the warden before a judicial petition may be brought.

[21] *See* fn. 3.

availability of effective vaccines within the Bureau of Prisons significantly mitigates the risk of severe illness or death, undermining the claim that a medical vulnerability automatically constitutes an extraordinary and compelling reason. Collins provides no scientific or medical evidence to show that his specific, individual health issues cannot be managed adequately by the medical staff at FCI Talladega.

Furthermore, FCI Talladega operates under a Modified Operations Matrix designed to suppress viral transmission. The facility monitors localized community transmission rates and enforces strict cleaning, masking, and social-distancing protocols whenever necessary. *See* BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/news/20200319_covid19_update.jsp. The presence of robust, structured institutional protocols disproves Collins's assertion that the Bureau of Prisons is mishandling the health environment[22]. *See* information about FCI Talladega Operations at https://www.bop.gov/locations/institutions/tdg/

Collins also points to the United States Supreme Court's decision in *Concepcion v. United States*, 597 U.S. 481, 142 S. Ct. 2385, 213 L. Ed. 2d 731 (2022), alongside an argument regarding the national average of sentences for federal murder convictions.

Collins's reliance on *Concepcion*, though, is legally misplaced. The Supreme Court in *Concepcion* did not alter the threshold definition of "extraordinary and compelling reasons" in the compassionate release context; rather it held that when considering motions under the First Step Act, district court may consider intervening changes of law or fact when exercising their

[22] BOP maintains that it prioritizes the safety and security of BOP institutions; to that effect, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf.

discretion. *Id*. A non-retroactive statutory change or a perceived disparity between an individual's sentence and national averages cannot independently serve as an extraordinary and compelling ground for a reduction. *Rutherford v. United States*, 146 S. Ct. 1320, 1335 (2026). This court, at sentencing, in 2009, imposed a legal, valid life sentence based on the horrific nature of Collins's crimes.

Collins argues that he no longer presents a danger to the community because he is 75, uses a walking cane, and is recovering from the effects of COVID-19. [Docket no. 124 at p. 12]. That is not enough to meet his burden given the nature of the offense for which he was found guilty and his criminal conduct preceding that conviction. This Court and others have rejected similar arguments with similar factual backgrounds. *See U.S. v. Blevins*, 2020 WL 3260098 (S.D. Miss. June 16, 2020) (denying compassionate release to an eighty-year-old defendant whose age and medical conditions potentially presented extraordinary and compelling reasons, but whose repeated solicitations of murder demonstrated a continuing danger to others); *U.S. v. DeSciscio*, 2020 WL 3893711 (D. N.J. July 10, 2020) (rejecting argument of 78-year-old defendant who had served approximately 32 years of his 75-year sentence and had prostate cancer, atrial fibrillation, and other health issues when the underlying crimes involved conspiracy to commit murder and murder); *see also United States v. Rollins*, 53 F.4th 353, 359–60 (5th Cir. 2022) (affirming district court's determination that a paraplegic with one amputated leg, who was imprisoned for possession with intent to distribute heroin, crack cocaine, and powder cocaine and possession of seven firearms in furtherance of those drug trafficking crimes, was still a danger to the community).

Additionally, Collins's criminal history prior to his conviction in this court involved convictions for failure to obey a police officer and exhibiting a weapon; simple assault whereby the complainant alleged Collins had hit her across the neck with a machete/kaiser blade; and

domestic violence whereby complainant had alleged Collins pulled a gun on her and hit her over her body. *See* Doc. 65 (Presentence Investigation Report). Collins's BOP inmate disciplinary data reveals numerous instances of refusing work/program assignments. *See* Exhibit 3 to ECF No. 132 (Disciplinary Record).

Defendant's highest level of education is the 9th grade. *See* Doc. 65. His criminal history placed him in category III with an offense level of 43. While the Government acknowledges that broad statistics indicate recidivism levels generally fall with age, they do not fall to zero, and this Defendant – with his record of past actions and a heinous crime – has not demonstrated he is in the class of persons for whom early release should be extended on the possibility he is no longer a danger to society.

This court follows the dictates of *Blevins* and other courts that have rejected similar arguments by other defendants that they no longer posed a danger to the community because of their age and medical conditions when the underlying offense and/or criminal history involved serious and violent crimes, particularly murder. *See United States v. Baye*, 464 F. Supp. 3d 1178, 1191 (D. Nev. 2020) (finding that a fifty-four-year-old defendant who used a cane remained dangerous in light of his extensive violent criminal history and repeated recidivism); *United States v. Lane*, No. CR-12-01419-01-PHX-DGC, 2021 WL 661982, at *6 (D. Ariz. Feb. 19, 2021) (concluding that the defendant's low-risk BOP PATTERN score did not overcome the seriousness of his offenses and extensive criminal history). Courts also have denied compassionate release when the offenses involved murder or murder conspiracies, emphasizing the seriousness of the conduct and the continuing need to protect the public. *See United States v. Dorsey*, No. 04-cr-128-21 (ESH), 2020 WL 4432248, at *4 (D.D.C. July 31, 2020) (denying release where the defendant's offense included murder and concluding that the seriousness of the offense prevented a sentence

reduction); *United States v. DeSciscio*, No. 88-cr-239, 2020 WL 3893711, at *7 (D.N.J. July 10, 2020) (denying release to a seventy-eight-year-old defendant convicted of offenses involving murder conspiracies and emphasizing the seriousness of his crimes, the need to protect the public from possible recidivism, and the need to deter violent crime).

Finally, Collins asks for the appointment of counsel and an expert medical witness. A convicted individual has no constitutional or statutory right to the appointment of counsel or expert witnesses when seeking a post-conviction sentence reduction under Title 18 U.S.C. § 3582(c)(1)(A). *United States v. Whitebird*, 55 F.3d 1007, 1011 (5th Cir. 1995). Collins's motion for compassionate release/sentence reduction is straightforward, the issues are clearly presented, and the existing record provides an ample basis for a decision; therefore, the court denies the requests for counsel and expert witnesses.

**C. Title 18 U.S.C. § 3553(a) Factors**

Even if Collins could establish an extraordinary and compelling reason, an independent evaluation of the sentencing factors set forth in Title 18 U.S.C. § 3553(a) compels the denial of his motion.

This court must weigh the nature and circumstances of the offense, the history and characteristics of a defendant, the need for the sentence to reflect the seriousness of the crime, the promotion of respect for the law, the provision of just punishment, and the protection of the public from future crimes. Title 18 U.S.C. § 3553(a).

Collins's criminal conduct was exceptionally heinous. He did not merely participate in a standard criminal conspiracy; he actively planned and executed a cold-blooded murder of Clovis Reed, a government witness. He ambushed her, struggled with her, choked her to death with his belt, drove her body to a high-crime neighborhood in Jackson, Mississippi, to deceive where the

murder actually had taken place, moved her body to another car to transport the body approximately 100 miles south, where he and Walker decapitated the body, severed her hands, buried the remains in a shallow grave, intending to return the next day for a deeper burial. Reed's mutilated body ultimately was found in the vicinity where the bones of a corpse, alleged to be those of the mutilated remains of Ebony Scott were found. According to Edmond's testimony, Ebony Scott also was sentenced to death by the same death squad. Later, Collins had placed Reed's head in a sack to show to the other conspirators, while bragging that he, and not the more muscular-appearing Walker had decapitated the body and severed her hands to prevent anyone from identifying the body.

An offense of this magnitude strikes at the very heart of the American judicial system. Witness tampering through violence undermines the rule of law and threatens the integrity of every federal court. Reducing a sentence of double life imprisonment to 25 years under these circumstances would completely fail to reflect the severe nature of the offense, would fail to provide just punishment, and would denigrate the serious costs of taking a human life to subvert justice.

This court acknowledges Collins's advanced age. Collins was 75 years old when he filed this motion. He does not contend that he suffers from a terminal illness; instead, he appears to argue that his medical conditions and age-related physical deterioration constitute extraordinary and compelling reasons for a sentence reduction. *See* U.S.S.G. § 1B1.13(b)(1)(B)–(C), (b)(2).

The record does not support Collins's argument. Collins states generally that he is "a 75 year old male, using a walking cane, and slowly recovering from the effects of contracting COVID-19," and that his health is "very poor." *See* Doc. 124 at 12–13. His medical records reflect chronic knee pain, osteoarthritis, hypertension, gastroesophageal reflux disease, and occasional other

health concerns. *See* Exhibit 4 (Medical Records). The records, however, do not establish that Collins is experiencing a serious deterioration in physical or mental health because of aging, that his conditions substantially diminish his ability to care for himself within the institution, or that he requires specialized medical care the Bureau of Prisons is unable to provide. Several of these conditions—including hypertension, acid reflux, and chronic arthritis—also predate his incarceration. *See* Doc. 65 at 11 ¶ 49 (Presentence Investigation Report).

Collins's request for the appointment of a medical expert does not cure this evidentiary deficiency. He must identify evidence in the existing record establishing his eligibility for relief; an expert cannot be appointed merely to search his medical records for a possible basis for release. Collins's age, use of a cane, and chronic but manageable medical conditions, therefore, do not establish extraordinary and compelling reasons for a sentence reduction under § 3582(c)(1)(A)(i).

This court also acknowledges that although rehabilitation efforts generally are commendable, federal law explicitly commands that rehabilitation efforts alone shall not be considered an extraordinary and compelling reason for a sentence reduction. Title 28 U.S.C. § 994(t)[23]. Collins's allegedly good conduct while incarcerated, in this instance, cannot overcome or erase the profound, calculated, brutality of his conspiratorial actions.

In this court's eye, the concurrent terms of life imprisonment remain completely necessary to protect the public, to deter others from targeting federal witnesses, and to satisfy the statutory mandates of just punishment.

[23] **Title 28 U.S.C. § 994(t)** provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."

## V. CONCLUSION

The law provides a mechanism for compassionate release, but it reserves such relief for truly extraordinary cases. Collins has failed to show extraordinary and compelling reasons. Furthermore, the statutory sentencing factors heavily favor the preservation of his original sentence to ensure public safety and just punishment.

**IT IS, THEREFORE, ORDERED** that Joe Lewis Collins's Motion for Compassionate Release / Reduction in Sentence pursuant to Title 18 U.S.C. § 3582(c)(1)(A) [Docket No. 124] is **DENIED**.

**SO ORDERED** this the 17th day of November, 2026.

**/s/HENRY T. WINGATE**
**UNITED STATES DISTRICT JUDGE**